*Philadelphia,*
*Thursday,*
January 11th.

## The Commonwealth *against* COCHRAN.

The act of 19th *February* 1801, which authorizes the receiver general to give certificates of credit to certain persons, whose lands fell within the state of New York, to be used in taking out new warrants, operates, so far as respects those warrants, as a repeal of all former laws requiring a *settlement* previous to the issuing of a warrant.

IN this case, *Hemphill* moved for a rule upon the defendant, the secretary of the land-office, to shew cause why a *mandamus* should not be awarded, commanding him to prepare and deliver patents to *Jonathan Smith,* for various tracts of land for which warrants had been issued in favour of *Peter Wikoff* and *Jonathan Bayard Smith,* under a law passed the 19th *February* 1801; and which warrants had been regularly transferred to the said *Jonathan Smith.*

The motion was founded upon the following facts, part of which were exhibited in a statement prepared by the counsel on both sides, and part appeared by official documents.

*Jonathan Bayard Smith, Peter Wikoff* and others, took up lands under warrants from the commonwealth of *Pennsylvania* in the year 1785. Upon ascertaining the north boundary line of the state, it was found that they fell within the state of *New York;* and upon the representation of this circumstance to the legislature, they passed a law on the 19th *February* 1801, in the following terms: " That the " board of property, upon application for that purpose by " *Jonathan Bayard Smith,* and *Peter Wikoff,* and others also, " whose lands fell within the state of *New York* on running " the north boundary line between this state and the said " state of *New York,* shall ascertain the amount of the pay- " ment made by them for the lands as aforesaid, and shall " certify the same to the receiver-general, who shall there-

---

"" upon deliver a certificate or certificates of such sum, with
" interest thereon from the time of the payment, to the said
" *Jonathan Bayard Smith* and *Peter Wikoff*, and others as
" aforesaid, and enter a credit in his book for the same,
" *which may be transferred to any person, and passed as*
" *credit, either in* TAKING OUT NEW WARRANTS IN ANY
" PART OF THE STATE WHERE LAND MAY BE FOUND, or in
" payment of arrears of former grants." 4 *St. Laws* 673.
Upon the first application by *Smith* and *Wikoff* to the board of
property to carry this law into effect, instead of making up the
account and certifying to the receiver-general, the board di-
rected the deputy surveyor to ascertain what parts of the tracts
were situated in *New York* and *Pennsylvania* respectively, and
to make return; but in *August* 1804, without taking notice of
any such return, they directed the account to be stated by the
receiver-general, by which a balance of 441*l*. 4*s*. appeared to
be due to *Wikoff*, and 973*l*. 13*s*. to *Smith*; and for these sums
credits were entered on his books, and certificates issued,
with which new warrants were taken out on the 6th of *Sep-
tember* 1804, and executed upon lands in *M'Kean* county &c.
within the *new purchase.* The surveys were returned into
the land-office, and accepted; but at the time the warrants
were executed, and up to the present time, no settlement
had been made nor grain raised, nor did any person reside,
on the lands on which they were laid; and therefore the
officers of the land-office refused to grant patents. It was
admitted that *David Meade* and others, under a similar law
passed the 9th of *March* 1796, had obtained warrants and
patents for lands in precisely the same circumstances as those
of *Smith* and *Wikoff*; and by consent the affidavit of *J. B.
Smith* was read, stating that all the land, but about twenty
acres of one tract and fifty of another, had been found to be
within the state of *New York*, and that he had released all his
right &c. in the lands to the state of *Pennsylvania*.

*Franklin* (attorney general) said that he appeared at the
instance of the board of property, who desired the opinion
of the court, and would acquiesce in it; and although at some
future time he might contend, that a case of this kind was
not proper for a *mandamus*, yet from a desire of the board to

possess a judicial opinion upon the question, he did not at present oppose the rule upon that ground. One objection to the patents, is, that *Smith* and *Wikoff* were entitled to credit for only that part of the land which fell within the state of *New York;* and therefore the return of the deputy surveyor under the first order of the board, was a preliminary to any credit at all. But the main objection is, that by the act of 22d *April* 1794, 3 *St. Laws* 581, the land-office was prohibited from issuing warrants for lands within the *new purchase,* " except in favour of persons claiming the same by " virtue of some settlement and improvement being made " thereon;" and by a supplement to that act, passed the 22d *September* 1794, 3 *St. Laws* 636, the office was prohibited from receiving applications for any lands within the commonwealth, except for such lands whereon a settlement had been, or should be thereafter made, grain raised, and a person or persons residing. As the warrants in this case were laid upon unsettled lands, they come precisely within the interdiction of those laws, and therefore they are not entitled to confirmation by patent. The law of 1801 was passed while the interdiction was in full force; and unless it operated as a repeal in a certain degree of the laws of 1794, there is no ground for the motion. It did not operate as a repeal for various reasons. It contains no terms which relieve the warrants issued under its authority, from restrictions imposed by other laws; and as it was passed at the solicitation of parties who must have known of these restrictions, an exemption from them if desired, would have been asked. If it operated as a repeal of any, it did of all restrictive laws; and then it would have been in the power of the parties to lay their warrants on land west of the *Alleghany* river, free from any condition of settlement, which would be in direct violation of the act of 3d *April* 1792, 3 *St. Laws* 209. It would also, if treated as a repeal, give the parties a bounty greatly beyond their merit, instead of an indemnity which alone was intended. Between the date of their first warrants, and those in question, the purchase money of lands had been reduced from 30*l.* to 5*l.* the hundred acres; and this was itself a sufficient advantage, without coupling with it an exemption from all the conditions upon which other citizens must purchase. From these circumstances it must result,

that the legislature intended only, that the holders of these credits, if they preferred taking warrants instead of paying arrears on former grants, should take them precisely on the same terms on which they were granted to other citizens, conformably to the existing laws of the commonwealth. The act is a private act in relation to a particular privilege, and is therefore to be interpreted literally. *Threadneedle* v. *Lyman* (*a*). The proceedings in the case of *David Meade* are of no authority; they are held by the present board of property to have been in violation of law.

*Hemphill* and *Ingersoll* for the rule, argued in answer to the first objection, that the board of property had no authority to direct a survey, the legislature having settled the fact that the lands fell within *New York*, and having assigned to the board nothing but the ministerial duty of calculating the amount of the payment for them. But if any thing was wanting to shew the state of the land, it was to be found in the affidavit of Mr. *Smith*. In answer to the principal objection, they contended that the practice under the law for the relief of *David Meade* and others, was of great weight, because it was known to the legislature when they passed a similar law in 1801; and if a change had been intended in the practice, there would have been a change in the law. On the language of the law, however, standing by itself, there can be no doubt. It contains no reference to prior laws, but is a direct authority to the individuals named, to take out warrants *immediately* for lands in any part of the state; and is therefore a repeal of all laws which prohibited warrants from being taken out, except after settlement and improvement made. It opens the land-office as to these parties, in the same manner as if the laws of 1794 had not passed. They are certainly to comply with all conditions imposed upon purchasers in the district where the warrants are executed; that is, if the warrants had been laid west of the *Alleghany*, they must have been followed by settlement; but purchasers to the eastward of that river are under no such obligation. The construction given by the board of property defeats the design of the law. The law authorizes

1810.

COMMON-
WEALTH
*v.*
COCHRAN.

(*a*) 2 *Mod.* 57.

warrants, which we agree to take upon the conditions on which warrants are always issued. The board say we must perform conditions before we get them. The law gives us interest to the date of the credit, but no longer, because we may use the credit at once to take out warrants. The board would compel us to sacrifice the use of the credit, for as many years as would be necessary to make a settlement and improvement, or to transfer it at a reduced price to persons who had already made them. The legislature have in fact confirmed our construction by an act passed the 1st *April* 1805, 7 *St. Laws* 210, which directs the payment of certificates under the act of 1801, out of the public treasury, and then *for the future* prescribes the condition of settlement and cultivation, which it did not while the certificates were not equal to cash. This law is a clear authority for the former practice of the board of property.

TILGHMAN C. J. after stating the case, delivered the court's opinion as follows.

The objection to the patents is founded on the act " to " prevent the receiving any more applications, or issuing any " more warrants, except in certain cases, for land within the " commonwealth," passed 22d *April* 1794, and a supplement thereto, passed 22d *September* 1794. These acts forbade the issuing of warrants or receiving applications for lands on which no settlement and improvement had been made; and it is contended, that as the warrants in question were laid on unsettled lands, their execution was illegal, and ought not to be confirmed by patents. It appears to us that this objection is not well founded. Upon a fair construction of the act of 19th *February* 1801, the persons in whose favour that law was made, had a right to take out warrants for their own use for vacant lands in any part of the state; and they were to pay the price, and comply with all the conditions imposed on the purchasers of land in that part of the state, where the lands lay. If they lay west of the *Alleghany* river, they would have to comply with the terms of settlement and improvement required by law to complete a title in that quarter; b if east of that river, nothing but the usual price in money was required. To give the act of 19th *February* 1801, any other construction, would be to deprive the persons intend-

ed to be compensated, of a very material benefit, I mean the benefit of taking out warrants for themselves. They would have been obliged to sell their warrants to settlers, which would have very much reduced their value, or to speak more properly, they might have transferred to settlers their credit on the books of the receiver-general; but would have had no right to take out warrants themselves, unless they either purchased the right of settlers, or seated themselves on the lands intended to be taken up. This never could have been the intent of an act, by which it was designed to make a liberal compensation to persons who had paid money to the state through a mistake of its own officers. The compensation was liberal, because it included interest to the time of issuing the certificates. No interest was allowed on those certificates, because it was supposed that the holders might immediately use them as cash, by taking out new warrants. The opinion of this court is that the act of 19th *February* 1801, operated as a repeal of all former acts, requiring a settlement *previous* to the issuing of a warrant, so far as concerned warrants to be issued in favour of those persons who obtained credit in the books of the receiver-general in the manner above mentioned. They therefore allow the motion.

Rule granted.